**LAUTH INDIANA RESORT & CASINO, LLC, Appellant,**

v.

**LOST RIVER DEVELOPMENT, LLC,** Auburn Gaming Company, LLC and Merit Gaming Group, LLC, jointly and severally as members of Lost River Development, LLC, an Indiana limited liability company, Appellees.

No. 29A02–0710–CV–839.

Court of Appeals of Indiana.

July 15, 2008.

Alan S. Townsend, Bryan H. Babb, Paul D. Vink, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellant.

Henry J. Price, Carol A. Nemeth, Price Waicukauski & Riley, LLC, Indianapolis, IN, Gary A. Grasso, Grasso Bass & Williams, P.C., Burr Ridge, IL, Attorneys for Appellees.

## OPINION

MATHIAS, Judge.

Appellant–Defendant Lauth Indiana Resort & Casino, LLC ("Lauth") brings this interlocutory appeal from the order of the Hamilton Superior Court denying its motion for partial summary judgment in the suit brought against Lauth by Appellees–Plaintiffs Merit Gaming Group, LLC ("Merit"), Auburn Gaming Co., LLC ("Auburn Gaming"), and Lost River Development, LLC ("Lost River"). We reverse and remand.

### Facts and Procedural History

In response to 2003 legislation calling for the construction of a riverboat casino project in Orange County, Indiana, the Indiana Gaming Commission ("IGC") issued a request for proposals ("RFP") on March 5, 2004, soliciting proposals from those wishing to enter into an Operating Agent Contract for the construction and management of a casino development project in Orange County. With a $50,000 application fee just to submit a proposal, only three groups did so: Trump Indiana Casino Management, LLC ("Trump Indiana"), Orange County Development, LLC (a group affiliated with French Lick native Larry Bird), and current Appellee–Plaintiff Lost River.

Lost River was formed by Merit and the predecessor in interest of Auburn Gaming. Merit was itself composed of the founders of Empress Entertainment, LLC, who had operated Empress-branded riverboat casinos in Hammond, Indiana and Joliet, Illi-

nois. In March 2004, Lost River submitted its development proposal to the IGC.

After Lost River had submitted its original proposal, it was contacted by Appellant–Defendant Lauth, a commercial developer based in Indianapolis, who wished to become involved with the Lost River proposal. The existing Lost River members and Lauth formalized their agreement in a document referred to as the "Letter Agreement," which provided that Lauth would obtain a 50% ownership interest in Merit Indiana, LLC,[1] which in turn owned a 50% ownership interest in Lost River.[2] The parties agree that the Letter Agreement created a joint venture. However, the Letter Agreement was silent as to when, or under what circumstances, the joint venture would end. With Lauth now participating in the joint venture, the parties submitted an amended proposal to the IGC under the name of Lost River on April 16, 2004. The estimated capital budget for the amended Lost River proposal was to be $40 to $50 million.

On July 20, 2004, the IGC held a hearing to choose which applicant's proposal to select. From the transcript of the IGC's hearing, it is apparent that the IGC was not impressed with the proposal from Orange County Development, despite the involvement of Larry Bird. The IGC members mostly discussed whether to choose Trump Indiana or Lost River, and it appeared to be a close decision. Notably, the IGC had concerns regarding Trump Indiana's financial situation and wondered if Trump Indiana would be able to procure financing for its proposal. In the end, the recommendation of the Orange County Historic Hotel Preservation Commission,

the support of locals, and the power of the "Trump" brand tipped the balance in favor of Trump Indiana despite its financial problems, and the IGC voted 4–2 to award the Operating Agent Contract to Trump Indiana. This award was "contingent upon the negotiation and execution of the Operating Agreement Contract." Appellant's App. p. 695.

After their proposal was not selected, the Lost River parties discussed what had gone wrong with their proposal. They were also hopeful that Trump Indiana would not be able to escape its economic troubles and procure financing, because if it did not, there was hope that the Lost River application might yet be selected. The parties exchanged extensive communications about the possibility that the Lost River proposal might yet be chosen.

Merit's designated evidence indicates that the parties agreed to wait to see if Trump Indiana failed to meet the conditions imposed by the IGC and continue efforts to pursue the Operating Agent Contract. Lauth claims that it believed that Merit had dropped the ball with regard to its portion of the proposal and blamed Merit for the Lost River proposal not being selected. Therefore, unbeknownst to the other Lost River members, Lauth began to contact gaming companies other than Merit to see if they would be interested in teaming with Lauth in case the IGC rescinded its award to Trump Indiana.

The IGC's concerns over Trump Indiana's finances were well founded; Trump Indiana was in fact unable to meet the conditions imposed by the IGC and, by the end of 2004, had filed for Chapter 11

---

**1.** Merit Indiana is apparently a subsidiary of Merit.

**2.** Lauth's predecessor in interest, Orange County Partners, LLC, was the party named

in the Letter Agreement. Lauth later became the majority owner in Lost River so that the parties could promote Lost River as an Indiana-owned company.

bankruptcy. On March 23, 2005, the IGC withdrew its conditional award of the Operating Agent Contract to Trump Indiana. The IGC then considered two options on how to proceed: either return to the remaining initial applicants, or issue a second request for proposals. The IGC voted for the latter option and eventually issued a second request for proposals that was substantially identical to the initial request.

On March 29, 2005, after the IGC voted to issue the second RFP but before it was actually issued, Lauth sent Merit a letter informing it that Lauth would not be working with Merit or the other Lost River members on a proposal in response to the new RFP. Instead, Lauth teamed with another company, Cook Group, Inc. ("Cook Group"), to submit a development proposal to the IGC under the name of Blue Sky Casino, LLC ("Blue Sky"). The Blue Sky proposal was far grander than the Lost River proposal had been, calling for a capital budget of over $240 million rather than the $40 to $50 million budget of Lost River's original proposal. Also, Blue Sky, through the Cook Group, already owned the two historic hotels in French Lick and West Baden.

Merit and Auburn Gaming were apparently caught off guard by Lauth's change of plans and were unable to find another development partner before the deadline for the second RFP. They therefore sought and were granted a one-week extension. Despite this, they were still unable to prepare and present a proposal. On June 23, 2005, the IGC held another hearing and conditionally awarded the Operating Agent Contract to Blue Sky. Blue Sky obtained the requisite financing and entered into the Operating Agent Contract

with the IGC on November 9, 2005. The Blue Sky Casino project was completed and opened for operation on November 1, 2006.

Merit and Auburn Gaming were not pleased with this turn of events. On November 23, 2005, a complaint was filed in the names of Merit, Auburn Gaming, and Lost River naming as defendants Lauth, the Cook Group, Blue Sky, and various individuals who were members of Lauth and the Cook Group. This complaint was amended on May 4, 2006 and alleged, *inter alia,* that Merit, Auburn, and Lauth had entered into an enforceable contract for a joint venture to develop, own, and manage the casino project. The complaint alleged that, by teaming with the Cook Group to form Blue Sky, Lauth had breached this contract and further alleged that Lauth and several of its members had violated their fiduciary duties by usurping a corporate opportunity.[3]

On June 2, 2006, Lauth filed a motion for partial summary judgment, claiming that the Letter Agreement formed at most a joint venture, which terminated as a matter of law when the IGC chose Trump Indiana's proposal over the Lost River proposal. After the plaintiffs responded, the trial court held a hearing on the motion for partial summary judgment on February 23, 2007. On May 18, 2007, the trial court issued an order denying the defendant's motion for summary judgment, concluding in relevant part:

16. The Letter Agreement did not contemplate a second application and request for proposal. However, Plaintiffs have submitted affidavits from plaintiff's principals Joseph. J. Canfora, Peter A. Ferro, Jr. and Thompson Smith, that

---

3. The complaint also alleged that Lauth and its members intentionally misrepresented various facts to the plaintiffs and that Lauth, the

Cook Group, and their members tortiously interfered with the contract formed by the Letter Agreement.

the parties continued to pursue the OAC [i.e., the Operating Agent Contract] with the Lauth Defendants in light of the IGC's vote in favor of Trump. Similarly, the record also is replete with communications from Lauth Indiana principals continuing to deal with plaintiffs and the IGC after July 20, 2004 (including Lauth Indiana sharing confidential communications from Lauth Indiana attorneys dealing with the IGC about Trump and the OAC, and e-mails from Lauth Indiana to then HHPC member Steve Ferguson attaching revised development agreements from Lost River in December 2004) in apparent anticipation that Trump would not be able to meet the IGC conditions to execute the OAC.

17. When there is a joint venture formed, as there was here with the Letter Agreement, the generally accepted law of joint ventures is that "a joint venture without a termination date remains in force until its purpose is accomplished or until that purpose becomes impracticable." *Scandinavian Airlines Sys. Denmark–Norway–Sweden v. McDonald's Corp.*, 129 F.3d 971, 973 (7th Cir.1997).

18. The actions of the parties after the July 20, 2004 date the contract was conditionally awarded to Trump create a genuine issue of material fact as to whether the contract was impossible or impracticable after that date.

Appellant's App. pp. 38–39. Lauth filed a motion to certify the trial court's ruling for interlocutory appeal on June 7, 2007, which the trial court granted on August 31, 2007. On October 20, 2007, this court accepted interlocutory jurisdiction, and this appeal ensued.

### Discussion and Decision

Upon review of a trial court's decision on summary judgment, our standard of review is well settled: summary judgment is appropriate only where the designated evidence reveals no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Garneau v. Bush*, 838 N.E.2d 1134, 1140 (Ind.Ct.App.2005), *trans. denied.*

Lauth admits that the Letter Agreement formed a joint venture for the development of the Lost River casino proposal, but Lauth claims that this joint venture ended as a matter of law when the IGC chose the proposal of Trump Indiana. Thus, Lauth claims, it could not have breached the Letter Agreement or breached any fiduciary duties to the other joint venturers because the joint venture was no longer in existence at the times in question.

Merit agrees that the Letter Agreement formed a joint venture. However, Merit argues that there is at least a genuine issue of material fact with regard to whether the joint venture was still in existence. Merit focuses its argument on the extensive contact between the parties which occurred *after* the times which Lauth now claims acted to end the joint venture as a matter of law. Merit argues that if Lauth truly believed that the joint venture had ended, then Lauth would not have communicated with the other joint venturers as if the joint venture were still in existence.

■ The parties further agree that this case presents an issue of first impression in Indiana regarding precisely when a joint venture terminates in those cases where the joint venture agreement itself contains no specific termination date. Although research has revealed no Indiana case which has addressed this issue, there does seem to be a consensus among our sister states and in federal jurisdictions with regard to this issue. Specifically, the generally ac-

cepted law of joint ventures is that "[a] joint venture without a termination date remains in force until its purpose is accomplished or that purpose becomes impracticable." *Scandinavian Airlines Sys. Denmark–Norway–Sweden v. McDonald's Corp.*, 129 F.3d 971, 973 (7th Cir.1997); *see also* 48A C.J.S. *Joint Ventures* § 15 (2004) (stating that the general rule is that a joint venture remains in place unless its primary purpose or contingency has become impracticable or impossible to accomplish). Both parties urge us to adopt this rule, and we see no reason not to do so. But this does not end our discussion. To apply this rule, we must determine if and when the purpose of the joint venture between the parties was accomplished or became impossible or impracticable.

■ The first step in resolving this question is to determine what the purpose of the joint venture was. Lauth claims that the purpose of the joint venture was to submit a proposal in response to the original RFP so as to procure the Operating Agent Contract for the Orange County casino development project. Merit claims that the purpose of the joint venture was not specific to any particular request for proposals but was instead simply to procure the Operating Agent Contract.

■ In answering this question, we first observe that a joint venture is an association of two or more parties formed to carry out a single business enterprise for profit. *Byrd v. E.B.B. Farms*, 796 N.E.2d 747, 753 (Ind.Ct.App.2003), *trans. denied.* A joint venture is similar to a partnership except that *a joint venture contemplates only a single transaction. Id.*

Here, the Letter Agreement provides that Lost River was "formed to engage in licensing, developing, constructing, managing, and operating a casino in the historic hotel district in Orange County, Indiana (the 'Casino') and potentially developing, constructing, managing, and operating the West Baden hotel (the 'Hotel')." Appellant's App. p. 151. Merit claims that this supports its position that the joint venture was not limited to any particular RFP. We agree with Lauth, however, that the remainder of the Letter Agreement reveals that none of the parties anticipated that there would be another RFP. For example, the Letter Agreement called for the parties to use their best efforts to seek the approval of the IGC to file an amended proposal with Lauth as a member. If the IGC did not give such approval, then the Letter Agreement was to terminate. This ties the joint venture to the proposal submitted in response to the first RFP issued by the IGC. Thus, we conclude that, pursuant to the terms of the Letter Agreement itself, the joint venture contemplated only one proposal and the Letter Agreement is silent with regard to what would happen if the Lost River proposal was not chosen by the IGC.

■ Merit nevertheless claims that the purpose of the joint venture was not impossible or impracticable even after the IGC had chosen the Trump Indiana proposal. Merit points to the designated evidence which shows that the Lost River parties anticipated that Trump Indiana would be unable to procure financing and ultimately be unable to secure the Operating Agent Contract. Lauth responds by arguing that any conduct between the parties that occurred after the award to Trump Indiana is irrelevant because the joint venture ended as a matter of law when the IGC·chose the Trump Indiana proposal. In support of its position, Lauth relies mainly upon the holding of the Seventh Circuit Court of Appeals in *Scandinavian Airlines Sys. Denmark–Norway–Sweden* (hereinafter "*SAS*").

In that case, the City of Chicago issued a request for proposals for the development and operation of concessions and shops at a new terminal at O'Hare airport. SAS signed a letter of intent with McDonald's Corp. and Carson International to submit a development proposal. The parties submitted their proposal, but the city chose the proposal of another party. When negotiations between the city and the originally-selected party broke down, the city issued a second request for proposals. This time, McDonald's submitted a proposal with a new partner, not SAS. The city accepted this proposal and ultimately negotiated a contract with McDonald's and its new partner for the development project. When SAS learned that McDonald's had won the contract with a new partner, SAS filed suit alleging that McDonald's had violated the joint venture formed by the parties. The district court granted summary judgment against SAS.

Upon appeal, SAS argued that the letter of intent signed by SAS, McDonald's, and Carson created a joint venture which should have extended to the second request for proposals. The Seventh Circuit Court of Appeals held that, even if the letter of intent did form a joint venture, summary judgment was proper. 129 F.3d at 973. The court noted the general rule regarding the termination of joint ventures without explicit termination dates, as stated above. The court then held that once the city rejected the parties' original proposal, the joint venture became "impracticable and all obligations of the parties to each other ceased." *Id.* The court reasoned:

> The joint venture was terminated because the sole purpose for the formation of the partnership was to pursue the City contract. When this opportunity ceased to exist because the City selected [the original winning bidder's] proposal, the joint venture also ceased to exist. Each party satisfied its obligation under the agreement. Once the City rejected [their initial] proposal, SAS, McDonald's, and Carson were free to pursue other opportunities, including entering into a joint venture with a third party and preparing and submitting a proposal with that third party pursuant to [the second request for proposals].

*Id.* at 973–74. Therefore, the court held that McDonald's had not breached its joint venture agreement or otherwise violated any duty it owed to SAS. *Id.* at 974.

We agree with the reasoning of the *SAS* court and choose to follow its holding. In fact, we find *SAS* to be substantially indistinguishable from the case before us. In both cases, parties formed a joint venture to submit a proposal in response to a request for proposals; the joint venture's submission was not chosen, but the originally-chosen party was eventually unable to secure the contract; and one of the original joint venturers teamed with another party and ultimately secured the contract, to the consternation of the former joint venturers.

Therefore, under the agreed facts and circumstances before us, once the IGC rejected the Lost River proposal,[4] the joint venture terminated, and the parties were then free to pursue other opportunities, either with each other or with other parties. Thus, we also conclude that Lauth did not breach the joint venture agreement or violate any duty owed to the other parties to the joint venture. *See id.; see also Electrical Contractors, Inc. v. Goldberg & O'Brien Elec. Co.,* 29 Ill.

---

4. We can see no meaningful difference between saying the Lost River proposal was "rejected" versus saying that it was "not se-lected." As explained in *SAS,* such a "distinction is useless; the result is the same." 129 F.3d at 973.

App.3d 819, 331 N.E.2d 238 (1975) (rejection of joint venturers' bid terminated joint venture, after which parties had no obligation towards each other and were free to pursue the contract after the originally-chosen party failed to secure the contract); *Marmis v. Solot Co.*, 117 Ariz. 499, 573 P.2d 899, 903 (App.1977) (holding that joint venture between the seller's real estate agent and a prospective buyer ended when the seller rejected the prospective buyer's bid).

Merit tries to distinguish *SAS* by arguing that, in that case, the City's initially-chosen proposal was not "conditional," as it terms the selection of the Trump Indiana proposal. We do not consider it particularly relevant that the IGC's selection of the Trump Indiana proposal was "conditional" in the sense that such selection did not immediately award to Trump Indiana the Operating Agent Contract. This is typical of such bidding procedures, and, contrary to Merit's argument, is what happened in *SAS* as well. Although the court did not use the term "conditional," the City's initial selection was obviously not a final award of the contract, because negotiations between the initially-chosen bidder and the City broke down, requiring the City to issue a second request for proposals. Had the City's award been final, there would have been no further negotiations.

■ Merit also claims that *SAS* is distinguishable in that there was no indication of communications between the parties in *SAS* after their initial bid had been rejected. However, because we conclude that the joint venture ended as a matter of law when the bid was rejected, any communications between the parties which occurred after the bid was rejected are irrelevant to the question of when the joint venture ended.

We recognize that our holding establishes a bright-line rule. But we think our approach is particularly appropriate for dealing with joint ventures, which by their very nature contemplate only a single transaction. *Byrd*, 796 N.E.2d at 753. To hold as Merit would have us hold could result in joint ventures which are, for all intents and purposes, partnerships of indeterminate duration. Merit's position could force joint venturers who anticipated only one transaction, i.e. a single bid process, to be bound to each other, perhaps for years, expending resources long after their initial bid was rejected. In contrast, the bright-line approach we adopt allows parties to joint ventures to better quantify their risks.

We also emphasize that our holding applies only in cases where, as here, the joint venture agreement is silent as to when the joint venture terminates. Our conclusion might be different if the original RFP indicated that the proposals which were not selected remained valid in case the initially-winning party was unable to secure the Operating Agent Contract. However, the parties refer us to no such language in the original RFP. To the contrary, our review of the original RFP reveals a provision which states, "[a]fter selection of an operating agent, the [IGC] has the right to negotiate with the applicant in question and to negotiate changes, amendments, or modifications to the proposal as submitted without offering other applicants the opportunity to amend their proposals." Appellant's App. pp. 253–54.

■ In conclusion, we hold that if a joint venture is formed for the purpose of submitting a proposal or similar bid, and the joint venture agreement is silent as to when or under what circumstances the joint venture will end, then the joint venture ends, as a matter of law, when the

proposal or bid is rejected.[5] Therefore, the Lost River joint venture ended as a matter of law when the IGC chose the proposal of Trump Indiana. Lauth therefore did not breach the joint venture agreement or any duties it had to the other parties to the joint venture when it partnered with the Cook Group, and the trial court erred in denying Lauth's motion for summary judgment. The judgment of the trial court is reversed, and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

NAJAM, J., and VAIDIK, J., concur.

---

**5.** Because of our holding, we do not address Lauth's alternate arguments, i.e., that the joint venture ended when the IGC chose to issue a second RFP and that the Letter Agreement was an executory contract which was impossible to perform.